

FILED
Dec 28, 2020
10:07 AM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Elpidio Hernandez | ) | Docket No.     2019-02-0046 |
| | ) | |
| v. | ) | State File No.  92324-2018 |
| | ) | |
| Jones Fiber Products, LLC, et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Brian K. Addington, Judge | ) | |

---

### Affirmed and Certified as Final

---

The employee had four fingers of his right hand accidentally amputated when he reached past the guard on a fabric-cutting machine to remove fabric that had clogged the machine. The employer denied the employee's claim for benefits, asserting no compensation was due because of the employee's willful violation of the employer's safety rules. Following a trial, the court found the employer instituted and enforced safety rules, the employee was aware of and willfully violated the rules, and the employee did not have a valid excuse for violating the rules. The court denied the employee's claim, and the employee has appealed. We conclude the evidence supports the trial court's decision, and we affirm and certify as final the trial court's compensation order denying benefits.

Judge David F. Hensley delivered the opinion of the Appeals Board in which Presiding Judge Timothy W. Conner and Judge Pele I. Godkin joined.

David F. Peeples, Knoxville, Tennessee, for the employee-appellant, Elpidio Hernandez

Connor Sestak, Nashville, Tennessee, for the employer-appellee, Jones Fiber Products, LLC

### Factual and Procedural Background

On December 1, 2018, Elpidio Hernandez ("Employee") suffered amputations of the four fingers of his right hand when he reached his hand past a guard on a fabric-cutting machine to clear pieces of fabric that had clogged the machine.[1] His employer at the time,

---

[1] The record indicates Employee was also known as Erasmo January.

1

Jones Fiber Products, LLC ("Employer")[2], had a "Lockout/Tag-out Program" in place that required employees to shut off all energy sources to machinery and lock out the machinery before reaching past a guard or performing service or maintenance on a machine. According to Monica Cadaret, Employer's Vice President of Operations, tools were provided for different pieces of equipment that could be used to clear jams without turning off the machines, but if an employee was unable to clear a jam in the cutter machine with the tool, the machine had to be turned off and locked out before the guard was removed to clear the jam. She testified it was not a violation of the lockout/tag-out policy to use the tool without turning off the machine.

Employee testified with the assistance of an interpreter, stating that his primary language was Spanish and that he did not speak very much English. He had worked for Employer for more than a year before his injury and was given training in Employer's lockout/tag-out program that included written materials and videos in Spanish. He testified he had observed co-workers failing to follow the lockout/tag-out policy about "eight to ten times" per shift and that it was common for employees to "put our hand in there so that we don't have to shut the machine down and so it's quicker and we don't stop production." He said his co-workers and he did this "all the time. Everybody did it . . . to not stop production." He testified there was an incentive to keep up production, stating that employees could receive a six percent production bonus each week if production reached a "level that's expected."

Employee worked in two different parts of Employer's facility. He testified he primarily worked in Section 3, but he worked in Section 2 "[e]very time when an employee did not show up for that section, which was about two times a week." When he began working with Employer, he worked three days in Section 3 before moving to Section 2, but after two months in Section 2 he went back to Section 3 "because the pressure was too much in Section 2." He explained that Gustavo Mendez was the line leader in Section 2 and that whenever fabric got tangled up "he wanted us to get it out quickly. Whether it was with a [tool] or with your hand, he just wanted production to continue." Further, Employee testified he saw Mr. Mendez using his hand to untangle fabric "all the time," adding that Mr. Mendez "ha[d] been working there for 14 years, and he ha[d] always done that to continue with production." Employee said he never saw Mr. Mendez or his co-workers get their fingers or hand cut by reaching into the machine to clear a jam.

Employee testified Mr. Mendez "never allows the machines to stop," adding that "he always gives people breaks in a way to make sure that the machines never stop. When somebody goes to break, [Mr. Mendez] fills in to make sure that production does not stop."

---

[2] Employer is referred to by various names throughout the record. Employer's First Report of Work Injury or Illness identified Employer as Jones Fiber Products, Inc. The Tennessee Secretary of State's business records indicate the business name was changed on December 23, 2019 from Jones Fiber Products, Inc., to Jones Fiber Products, LLC.

Employee stated that it was more of a struggle to produce when someone was away at break and that "sometimes you have to turn off the machines and then production stops, and when [Mr. Mendez] returns from his break, he's angry that production . . . stopped." Employee testified he reached his hand into the machine when his accident occurred "because of the same pressure" he felt from Mr. Mendez, stating that Mr. Mendez "does not want us to turn off the machines so that production does not stop." Employee testified that a tool was available "sometimes" to clear a jam, but that the tool was not always available. When asked whether the tool was available at the time of his accident, he said he did not remember "because whenever fabric would get tangled up, the pressure was too much to disentangle it quickly, so we would put our hands in sometimes."

Employee testified that during the time he worked with Employer before his accident he did not know of any of his co-workers or Mr. Mendez being disciplined for putting their hands into the machines. His explanation for why no one was punished for violating the safety rules was that Employer "did not want us to slow down production. They wanted the machines to always be running."

On cross-examination, Employee was presented with his deposition testimony in which he stated that, before his December 2018 accident, he had not ever stuck his hand into any machines to remove fabric. He admitted testifying that he had not stuck his hand into a machine before his accident, but explained that at the time of his earlier testimony he "was nervous; [he] had never been in a court or things like that, so that's when [he] did it," adding that since the time of his deposition he "had time[] to think things over and to calm down, and now [he] realize[s] it." Employee was also questioned about his testimony on direct examination that he had witnessed co-workers violating the lockout/tag-out policy "eight to ten times per shift." He reaffirmed this testimony but was unable to recall any specific incident in which someone had violated the policy. He agreed that if there were eight to ten violations of the policy per shift, there would be more than 3,000 violations over the course of a year. He also agreed that if his co-workers were sticking their hands in the machine like he did someone else probably would have cut their hand. He testified he was not aware of anyone else cutting their hand in a machine.

Employee admitted he was trained in the lockout/tag-out policy and that several times he viewed a video that specifically told him he was not to stick his hand in a machine while it was running. He also testified his supervisor in Section 3 gave him "hands-on safety training," including training not to stick his hand in machines. He testified that he had notice of and understood the lockout/tag-out policy, and that he understood the danger in violating the policy. Further, he admitted he violated the safety rules, explaining that "everybody does it so that you don't turn off the machines and stop production."

When Employee was questioned about whether he had an excuse for putting his hand into the machine, he acknowledged it was wrong to do so, but explained that his reason for putting his hand into the machine to clear the fabric was "because [Mr. Mendez]

3

does not want the machines to be turned off. He pressures us a lot, and all he's interested in is for us to get production." Employee admitted that Mr. Mendez never told him not to turn off the machine, adding "but he would get very mad when we had to shut it down."

Employee called a former co-worker, Teresa Zalpa, as a witness. She testified she worked for Employer for almost four years but was fired in December 2019. When asked whether she received training in the lockout/tag-out policy, she testified she "[had] not heard that word," and stated she did not receive training about where employees should not put their hands. She testified that when she worked with the fabric cutting machine it would sometimes become clogged and that she would put her hand in the machine and pull the piece that was stuck. She said she did so "on occasion" but that her fingers or hand never were cut by the machine. Asked how she was able to avoid getting hurt when she put her hand in the machine, she stated "I guess it was just . . . luck, because many of us put our hands in there." She testified she saw Mr. Mendez reach his hand into the cutting machine when it was running and that she did not recall anyone being reprimanded for putting their hand in the machine.

On cross-examination, Ms. Zalpa admitted that "maybe" she had heard of the lockout/tag-out term but said she never understood what it meant because "they did not explain it." When presented a document indicating she was trained in Employer's lockout/tag-out program, she admitted the document included her signature but stated she had not read the document. She admitted the document stated that she was trained in the policy and understood the consequences of violating the policy. She also admitted that she had a grudge "with the people inside [Employer], but not with the whole manufacturing facility."

Employee also called David Lee Walker, another former co-worker, who testified that Employee trained him when he started working with Employer, including training him in the lockout/tag-out policy. Mr. Walker said he thought Employee had a good understanding of Employer's lockout/tag-out policy. He testified there was a fabric cutting machine in the area where he worked that was similar to the machine on which Employee was injured, and that the machine would sometimes get clogged with trim pieces. He said he would sometimes use his hand to clear the machine, and in doing so, he would put his hand in an area where it could be cut by the machine. He admitted it was a safety violation to use his hand to clear the machine and said he saw others violate the safety rule by reaching their hands into the machine. He testified that "countless times" he looked into Section 2 and saw Mr. Mendez reaching his hand into the cutting machine to get material unclogged from the machine while it was running. However, he added that he couldn't tell for certain that Mr. Mendez was reaching in the machine far enough to put his fingers or hand in danger of being cut. Nonetheless, he said that just reaching in the machine was a violation of the safety rules.

4

Mr. Walker also testified he had observed Ms. Zalpa, Employee, and others reaching in the cutting machine with their hands before Employee's accident. He stated the lockout/tag-out policy was violated daily. He testified he became a line leader in Section 3 and that, as a line leader, it was his responsibility to watch for safety violations. He said he saw safety violations that he did not report, and when asked if there was any reason he did not report the violations, he stated, "[i]t was just everybody [he saw] doing it," and "this was not a violation to me. . . . It was normal." He attributed never being injured by the cutting machine as "luck." He also testified that most of the time employees were not punished for violating Employer's safety rules and that Employer's enforcement of its safety rules was inconsistent.

On cross-examination, Mr. Walker was asked about his deposition testimony in which he provided several answers that contradicted his trial testimony. His responses to some of the questions asked of him on direct examination were the opposite of his deposition testimony. Mr. Walker had explanations for some of the discrepancies but admitted that he had testified differently in his deposition with respect to others. He was also asked about information that he failed to disclose to Employer in his application for work concerning his criminal record. He admitted failing to disclose some convictions, stating "[b]ut at the same time, I honestly didn't think I was even going to get the job."

Employer called three witnesses at trial. In addition to Ms. Cadaret, Employer called Mr. Mendez and Ken Hanna, one of Employer's day shift supervisors. Ms. Cadaret testified concerning Employer's lockout/tag-out policy and the training employees received concerning the policy, which she said included a video that could be viewed in Spanish or English.

Ms. Cadaret was not present at Employer's facility when Employee's accident occurred. She received a phone call from the supervisor of the department where Employee had been working advising that Employee had been injured and had his fingers amputated. She instructed the supervisor to relocate the other employees from the department where the accident occurred to the cafeteria until she arrived at the facility. Employee had already been transported to the hospital when she arrived at the facility. She had the employees return to the location where they were at the time of the accident as part of her accident investigation. She testified that the tool used by employees to clear fabric was located on top of the machine next to where Employee would have been standing. She admitted it was possible that someone had placed the tool there after Employee's accident but indicated she thought the tool was on the machine at the time of the accident. She also testified about Employer's practice of documenting safety violations, its enforcement of safety policies, its procedure for investigating reports of safety violations, and the disciplinary action that is taken in the event of a safety violation.

Mr. Mendez testified he had been working at Employer's facility for 15 years. He described Employer's lockout/tag-out program and the training employees were provided

concerning the program. He testified that Employer enforced its safety rules, including the lockout/tag-out rules. He was present at the time of Employee's accident but said he was located eighty to one hundred feet from him and did not see the accident. He denied ever telling an employee to put his or her hand into a machine to unclog it and testified he never told an employee not to follow proper lockout/tag-out procedures to unclog a machine. He denied reaching past the machine guard to try to unclog the machine with his hands and said he always used the tool that was provided. He testified he did not see employees using their hands to clear fabric jams.

Ken Hanna testified he had worked for Employer for twelve years, most recently as a day shift supervisor for two years, and a night shift supervisor prior to that. He testified he was familiar with Employer's lockout/tag-out program and said Employer did enforce the rules. He denied ever violating the lockout/tag-out rules and said that when he had witnessed others violating the rule, they were disciplined. He explained that the program requires a first violation be treated with a five-day suspension and that a second violation resulted in automatic termination. He denied witnessing any violations that he did not report, and he denied telling any employee to place their hand in a machine to unclog it. He also denied ever telling an employee not to follow proper lockout/tag-out procedures if a machine became clogged. He testified that "[e]arly on, . . . especially with new people," he had seen workers try to clear a jam with their hand and had to reprimand them. He described having to "get them to fight that instinctive urge" to place their hand in the machine to clear it. He said he did not leave inexperienced people alone at the front of the machine and "gradually introduced" them to the cutting table and to the functions that involve clearing jams because he wanted to make sure they used the right methods when dealing with jams.

In its order denying Employee's claim for benefits, the trial court stated that it "is compelled to first address witness credibility." After identifying factors considered by the court in assessing witness credibility, the court concluded that "Monica Cadaret and Ken Hanna were credible." According to the trial court, "[t]he remaining witness[es] for [Employer] and . . . for [Employee] seemed nervous and hesitant; they changed [their] answers on the stand or from prior testimony; and they displayed bias rather than honesty." The court concluded that "most of their testimony was not credible."

The parties stipulated to facts that would make Employee's claim compensable unless the claim was barred by Employee's willful failure to use a safety device as contemplated in Tennessee Code Annotated section 50-6-110(a). The trial court analyzed Employer's affirmative defense in the context of *Mitchell v. Fayetteville Public Utilities*, 368 S.W.3d 442 (Tenn. 2012) and addressed each of the elements necessary for an employer to successfully rely on the defense. The court noted that Employee admitted violating Employer's lockout/tag-out rules, and that the proof established that Employee had actual notice of the rules and the dangers associated with violating the rules. The court concluded that Employer enforced the safety rules and that Employee did not establish a

valid excuse for violating the rules. Accordingly, the trial court concluded that Employer "proved *Mitchell's* four factors by a preponderance of the evidence" such that Employee's claim was barred. Employee has appealed.

## Standard of Review

This case involves the resolution of disputed facts and the application of the law to the facts. The standard we apply in reviewing the trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2019). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2019).

## Analysis

In *Mitchell*, the Tennessee Supreme Court adopted a four-step analysis for evaluating an employer's statutory defenses of willful misconduct and the willful failure or refusal to use a safety appliance. For an employer to prevail on these affirmative defenses, the employer must establish the following: (1) the employee's actual, as opposed to constructive, notice of the rule; (2) the employee's understanding of the danger involved in violating the rule; (3) the employer's bona fide enforcement of the rule; and (4) the employee's lack of a valid excuse for violating the rule. *Mitchell*, 368 S.W.3d at 453; *see also Glasgow v. 31-W Insulation Co., Inc.*, No. 2017-05-0225, 2017 TN Wrk. Comp. App. Bd. LEXIS 51, at *13 (Tenn. Workers' Comp. App. Bd. Sept. 6, 2017).

In this appeal, Employee raises two issues concerning Employer's affirmative defense: (1) whether Employer proved bona fide enforcement of its lockout/tag-out safety rules, and (2) whether Employee had a valid excuse for violating the rules.

*Bona Fide Enforcement of the Safety Policy*

The trial court's order did not include a detailed analysis of Employer's bona fide enforcement of its lockout/tag-out rules, but it is evident from the court's order that its

7

conclusion that Employer enforced the rules rested, in large part, on the credibility of the witnesses. The court noted that Employer introduced documentary evidence of lockout/tag-out warnings it gave employees before Employee's December 2018 injury and stated that "[t]he evidence proves that [Employer] warned employees not to use their hands past the guard, and when anyone in authority noticed a [lockout/tag-out] violation, [Employer] warned the employee." Addressing Employee's testimony and that of Ms. Zalpa indicating employees often violated the rules without punishment, the court stated that it "[did] not find this portion of their testimony credible." In a footnote, the court noted that Employee had "also offered David Walker as a witness" but stated that the court "did not recount any portion of his testimony, as it found his testimony unreliable."

As noted above, when the trial judge has had the opportunity to observe witnesses' demeanor and to hear in-court testimony, we give considerable deference to the factual findings made by the trial court. *See, e.g.*, *Madden*, 277 S.W.3d 896, 898 (Tenn. 2009); *Kelly v. Kelly*, 445 S.W.3d 685 (Tenn. 2014). In *Kelly v. Kelly*, 445 S.W.3d 685 (Tenn. 2014), the Tennessee Supreme Court addressed the role of appellate courts in reviewing a trial court's factual findings:

> When it comes to live, in-court witnesses, appellate courts should afford trial courts considerable deference when reviewing issues that hinge on the witnesses' credibility because trial courts are uniquely positioned to observe the demeanor and conduct of witnesses. Appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. In order for evidence to be clear and convincing, it must eliminate any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. Whether the evidence is clear and convincing is a question of law that appellate courts review de novo without a presumption of correctness.

*Id.* at 692-93 (internal quotation marks and citations omitted). Having thoroughly reviewed the record, we do not find clear and convincing evidence that the trial court incorrectly assessed the credibility of any witness.

Employer's day shift supervisor, Mr. Hanna, testified he was familiar with Employer's lockout/tag-out program and that Employer did enforce the rules. He testified that when he witnessed others violating the rules they were disciplined. He denied witnessing any violations that he did not report, and he denied ever telling an employee not to follow proper lockout/tag-out procedures. Employee emphasizes Mr. Hanna's testimony that he had to get employees to "fight that instinctive urge" to place their hands in a machine to clear it, contending this "and other admissions underscore the importance of strict, continuous, and bona fide enforcement as opposed to merely *some* enforcement." (Emphasis in original.) As explained by Mr. Hanna, "[e]arly on, . . . especially with new people," he had seen workers try to clear a jam with their hand and had to reprimand them.

He said he did not leave inexperienced people alone at the front of the machine and, instead, "gradually introduced" them to the cutting table and to the functions that involve clearing jams because he wanted to make sure they used the right methods when dealing with jams.

Employee further questions Mr. Hanna's testimony and the trial court's determination that Employer enforced its safety rules by asserting Mr. Hanna was a day shift supervisor "and was therefore not competent to testify to the nature of enforcement on the night shift, where [he] was not present and where the accident took place." Additionally, Employee emphasizes that Mr. Hanna admitted that neither Employer nor he had any way of knowing whether an employee violated the lockout/tag-out rules unless their actions were "actually witnessed by himself or someone else."

Mr. Hanna testified that he had worked for Employer for twelve years, most recently as a day shift supervisor for two years. He testified that prior to his work as the day shift supervisor, he was the night shift supervisor and prior to being officially designated as the night shift supervisor, he "unofficially . . . ran the department, did the maintenance, and oversaw the shift in general." We find no merit in Employee's assertion that Mr. Hanna was not competent to testify to the nature of the enforcement of Employer's safety rules. Moreover, we do not find his testimony as evidencing an absence of bona fide enforcement of those safety rules.

Finally, Employee contends the documentary evidence introduced at trial indicating that "at different times some employees had been disciplined for various safety violations . . . merely suggests that [Employer] detected *some* instances of safety rule violations, resulting in *some* instances of discipline." (Emphasis in original.) Employee asserts this evidence does not "rise to the level of proving regular, much less[] strict or continuous[,] enforcement of the safety rule with the cutter machine." We find no merit in Employee's insistence and conclude the preponderance of the evidence supports the trial court's determination that Employer engaged in bona fide enforcement of the safety rules at issue.

*Valid Excuse for Violating the Safety Rule*

In the trial court, Employee asserted he was excused for his violation of Employer's lockout/tag-out rules for three reasons: (1) he saw other employees violate the rule without punishment; (2) he was under pressure to complete production; and (3) he was performing work for Employer. The trial court addressed each of these reasons and concluded Employee did not have a valid excuse for violating the safety rules. On appeal, Employee presents a single argument in support of his contention that he had a valid excuse for violating the lockout/tag-out rules, which is based on his assertion that Employer failed to prove the absence of a valid excuse. As stated in his brief, "[w]here Employer cannot prove they provided the [tool] to clear clogged fabric on the day of the accident, Employer cannot

prove Employee lacked a valid excuse for attempting to clear the clog with his hand." We are unpersuaded.

The trial court's compensation order stated that Employer "provided a hook to reach past the guard and clear the machine without locking out and tagging out," but the court did not make a specific finding as to whether the tool was present at the time of Employee's accident. Whether the tool was on the machine or otherwise available is not determinative of whether Employee had a valid excuse for violating the safety rules, and we need not decide this factual issue. While Employee asserts Employer cannot meet the last requirement of the *Mitchell* test absent proof the tool was available for Employee's use, Employee does not develop this argument in his brief or explain how the absence of the tool would relieve him from his obligation to follow Employer's lockout/tag-out rules. It is undisputed that the lockout/tag-out rules existed, that Employee was aware of the rules and understood the dangers in failing to follow the rules, and that Employee violated the rules. Employee provided no evidence to suggest the absence or unavailability of the tool in any way affected his ability to abide by Employer's lockout/tag-out rules. We conclude the preponderance of the evidence supports the trial court's determination that Employee did not have a valid excuse for violating Employer's safety rules.

## Conclusion

For the foregoing reasons, we affirm the trial court's compensation order denying Employee's claim and certify the order as final. Costs on appeal are taxed to Employee.



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Elpidio Hernandez | ) | Docket No. 2019-02-0046 |
| | ) | |
| v. | ) | State File No. 92324-2018 |
| | ) | |
| Jones Fiber Products, LLC, et al. | ) | |
| | ) | |
| | ) | |
| Appeal from the Court of Workers' | ) | |
| Compensation Claims | ) | |
| Brian K. Addington, Judge | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 28th day of December, 2020.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| David Peeples | | | | X | office@torreslawfirmtn.com |
| Connor R. Sestak Nicholas Akins | | | | X | csestak@morganakins.com nakins@morganakins.com |
| Brian K. Addington, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |

Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov